**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STOCKPORT MOUNTAIN** | : | **No. 3:11cv514** |
| **CORPORATION LLC,** | : | |
| **Plaintiff** | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **NORCROSS WILDLIFE** | : | |
| **FOUNDATION, INC.,** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court is Defendant Norcross Wildlife Foundation, Inc.'s motion for summary judgment. (Doc. 46). This motion is fully briefed and ripe for disposition.

**Background**

This case arises from a dispute over the interpretation of a conservation easement that Defendant Norcross Wildlife Foundation, Inc. (hereinafter "Norcross") holds on land owned by Plaintiff Stockport Mountain Corporation LLC (hereinafter "Stockport"). Stockport and Norcross are entities controlled by individuals who were neighbors. These individuals used the entities they controlled to purchase a neighboring tract of land and place a conservation easement on it. In this action, Stockport seeks a declaratory judgment that oil and natural gas exploration and drilling via surface wells is permitted by the conservation easement.

Norcross counters with a request for a declaration that such natutral gas activities are prohibited by the conservation easement. The relevant undisputed material facts are as follows.[1]

## A. Norcross' Acquisition of the Nowicki Parcel

Allan and Diane Nowicki (collectively the "Nowickis") formerly owned a 1,937 acre plot of land in Buckingham Township, Wayne County, Pennsylvania (hereinafter the "Nowicki Parcel"). (DSOF ¶¶ 21, 33). The Nowickis used the Nowicki Parcel for timbering and quarrying. (Id. ¶ 24).

The Nowicki Parcel is located across the street from Donald Rajoppi's residence. (Id. ¶ 23). Rajoppi, an experienced businessman,[2] testified as the designee for Stockport. (Id. ¶ 13). Richard Regan,

---

[1] The foregoing background section relies upon the statements of undisputed material facts submitted by both parties, (Doc. 47, Def.'s Statement of Undisputed Material Facts (hereinafter "DSOF"); Doc. 53, Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (hereinafter "PSOF")), as well as the complaint and answer, (Doc. 1, Compl. (hereinafter "Compl."); Doc. 36, Answer (hereinafter "Answer")).

[2] Rajoppi holds a bachelor's degree in economics from the University of Oklahoma and took post-graduate courses in accounting. (DSOF ¶ 14). Rajoppi founded Capra Enterprises in 1980, which currently operates a laundromat and car wash and formerly operated a movie theater and hotel. (Id. ¶ 17; PSOF ¶ 17). Prior to founding Capra Enterprises, Rajoppi worked for the Irving Trust Company in New York, New York, where he held several offices, including that of Vice President. (DSOF ¶ 15). Also prior to founding Capra Enterprises, Rajoppi served as the Executive Vice President in charge of lending for the Third National Bank. (Id. ¶ 16).

Norcross' former president and CEO, and Michael Leonard also own residences that neighbor the Nowicki Parcel.  (Id. ¶ 23; PSOF ¶ 23).

In 1991, Norcross became interested in purchasing the Nowicki Parcel to preserve it.  (DSOF ¶ 24).  Norcross made an offer to purchase the Nowicki Parcel directly from the Norwickis in 1998.  (Id.)  Rajoppi, Leonard and Reagan intended that Norcross would purchase the Nowicki Parcel to ensure that it would not be developed.  (Id. ¶ 25).  Rajoppi also asserts that he did not want substandard housing built on the property, but he expected that the property would still be used for timbering and hunting. (PSOF ¶ 25).

Stockport Forest Preservation, Inc., a wholly owned subsidiary of Norcross, purchased the Nowicki Parcel in a foreclosure sale in approximately August 1999.[3]  (Answer ¶ 6; DSOF ¶¶ 2, 26).  Norcross, through its wholly owned subsidiary SFP, paid for the entire purchase price of the Nowicki Parcel, including all sale costs and expenses.  (DSOF ¶ 26). Neither Rajoppi nor Leonard contributed to the payment of the purchase price.  (Id.)

_____

[3] Stockport Forest Preservation, Inc. converted to a limited liability company in May 2001, after which time it was known as Stockport Forest Preservation, LLC.  (Answer ¶ 6).  Both entities will hereinafter be referred to as "SFP."

**B. Transfer of Property from SFP to Rajoppi**

When SFP and Norcross first contemplated purchasing the Nowicki Parcel, it was anticipated that SFP would ultimately convey part of the parcel to Leonard and Rajoppi subject to a conservation easement. (DSOF ¶ 27). During these early conversations about the conservation easement, Reagan represented that the restrictions imposed by the conservation easement would not be overly burdensome. (PSOF ¶ 27).

On September 15, 1999, both Rajoppi and Leonard signed a "letter of understanding" prepared by Reagan. (DSOF ¶ 29). In this letter, the parties agreed that SFP would sell the recently acquired Nowicki parcel to Rajoppi and Leonard subject to a conservation easement. (Doc. 47-6, Def.'s Dep. Ex. 6, Letter dated Sept. 15, 1999). The letter explained that the conservation easement would include elements that limited development, hunting, timbering and quarrying. (Id.) The letter also stated that it was Norcross' intent to prohibit the construction of new roads on the property, "except as low-impact, temporary access to logging sites and quarrying." (Id.)

On December 21, 1999, Rajoppi and Leonard entered into a formal agreement with SFP for the sale of land. (DSOF ¶ 30). This agreement of sale provided that SFP would sell Rajoppi and Leonard 1,937 acres of real

4

property for a total of $360,000.00.  (Doc. 47-6, Def.'s Dep. Ex. 7,

Agreement of Sale).  This agreement provided, in part, as follows:

> This Agreement is also contingent upon Buyers accepting the
> terms of the Conservation Easement being placed upon the
> property by Seller. . . . [I]f Buyer is unwilling to accept the terms
> of the Conservation Easement, then Buyer shall have the right
> to terminate this Agreement of Sale . . . .  It is agreed by the
> parties hereto that the general terms of the Conservation
> Easement are outlined in a Letter Agreement dated 9/15/99
> from Richard Reagan . . . [to] the buyers herein.

(Id.)

After the agreement of sale was signed, Rajoppi and his attorney

were involved in discussions regarding the conservation easement to be

placed on the property, including whether it would permit the use of all-

terrain vehicles, timbering and hunting.  (DSOF ¶¶ 34, 43).  On November

9, 2000, Rajoppi's attorney returned a marked-up version of a draft

conservation easement to Norcross.  (PSOF ¶ 44).  This draft conservation

easement included a prohibition on "[i]ndustrial or commercial uses of any

kind" in a provision that resembles the industrial and commercial uses

provision that was ultimately placed in the final conservation easement.

(See Doc. 47-9, Def.'s Dep. Ex. 43, Letter dated Nov. 9, 2000).

By letter dated January 11, 2002, Norcross' counsel provided

Rajoppi's counsel with a draft conservation easement.  (DSOF ¶ 35).  This

letter states that the revised conservation easement "reflects several

changes that are intended to restrict activities on the property." (Doc. 47-6, Def.'s Dep. Ex. 15, Letter dated Jan. 11, 2002). Rajoppi was concerned about some of the restrictions to timbering and quarrying activities contained in the revised conservation easement, and certain changes requested by Rajoppi with respect to timbering and quarrying were eventually incorporated into the easement. (DSOF ¶¶ 35, 43; PSOF ¶ 35).

SFP granted Norcross the conservation easement at issue on March 15, 2002, after Rajoppi and his attorney had a full opportunity to review it. (DSOF ¶¶ 3, 39, 43; Doc. 47-7, Def.'s Dep. Ex. 18, Conservation Easement (hereinafter "CE")). The conservation easement was executed on behalf of SFP by Reagan, as SFP's manager, and on behalf of Norcross by Reagan, as Norcross' president. (DSOF ¶ 39). Despite his involvement in crafting the conservation easement, Rajoppi did not sign the conservation easement, which is devoid of any reference to Rajoppi. (Id. ¶¶ 39-41). In light of his role in shaping the conservation easement, Rajoppi has admitted that there was nothing about the conservation easement that he did not understand. (Id. ¶ 43).

In the spring of 2002, Rajoppi and his wife formed Stockport for the sole purpose of assuming ownership of the property that Rajoppi agreed to purchase from SFP. (Id. ¶ 19). Rajoppi is a member and owner of

6

Stockport and makes decisions for Stockport.  (Id. ¶ 20).  In a deed dated April 22, 2002, SFP granted Stockport 900 acres of the Nowicki Parcel (hereinafter the "Property") in exchange for $180,000, or approximately $200 per acre.[4]  (Id. ¶ 33).  The deed bestows ownership of the surface and subsurface rights of the Property to Stockport, and it does not reserve mineral rights for SFP.  (PSOF ¶ 11).   However, the deed conveyed the Property to Stockport "Under and Subject to all of the conditions of a certain Conservation Easement from [SFP] to Norcross Wildlife Foundation, Inc. . . ."  (DSOF ¶ 12; Doc. 47-7, Def.'s Dep. Ex. 19, Deed).

Rajoppi understood from the beginning of his negotiations with Norcross that it was an environmental organization.  (Id. ¶ 31).  Rajoppi also understood that Norcross and SFP intended to impose a conservation easement and that he had the ability to walk away from the sale if he disagreed with the terms of the easement.  (Id. ¶ 32).

### C. Relevant Terms of the Conservation Easement

The conservation easement executed by SFP and Norcross on March 15, 2002 begins with an explanation of its values and intent.  (See CE at 1-2).  Moreover, section 1 of the conservation easement sets forth its

---

[4] Stockport contends that, even though it is not included in the agreement of sale or deed, it donated $20,000 to the organization Trout Unlimited as part of the consideration paid for the property.  (PSOF ¶ 33).

purpose to preserve biodiversity and the environment of the Property:

> [SFP] hereby grants and conveys to [Norcross] a perpetual conservation easement in gross which [Norcross] accepts for the purpose of preserving the Conservation Values of the Property; the protection of plant life and wildlife biodiversity and the protection of wildlife habitats; and conserving and protecting the Property from soil erosion, water pollution, development, fragmentation, and other occurrences which might interfere with the Property's Conservation Values, or with the beauty and unique character of the Property as it exists in its current state . . . .

(Id. at 2).  The conservation easement provides that it "is constructed with the intention of conforming with the requirements for conservation easements under the Pennsylvania Conservation and Preservation Easements Act, Act 29 of 2001."  (Id.)

The Conservation Easement accomplishes its stated purpose by implementing a series of land use patterns and restrictions that Norcross has the power to enforce in perpetuity.  (See id.; DSOF ¶ 4).  The conservation easement prohibits the following activities on the Property:

> 4.  Prohibited Uses.  The following activities and uses are expressly prohibited:
>
> a)  All uses and activities in the Conservation Reserve Areas, except as permitted under Section(s) 4(m) and 5(b).
> .        .        .
> c)  Industrial or commercial uses of any kind, including commercial recreation, except home occupations that do not involve more than two outside employees, and do not involve outside storage of materials or supplies, equipment or

products. . . . This is intended to also prohibit commercial structures of any kind, including any commercial communication devices, signs or billboards.

.    .    .

f) Depositing, dumping, abandoning, or release of any solid waste or debris, or liquid wastes or chemical substances on the Property except that fertilizers, herbicides and pesticides for the purpose of maintaining or improving the growth of vegetation or the conservation of natural resources . . . .

.    .    .

i) Temporary housing such as tents, mobile homes, recreational vehicles, or other temporary dwelling structures or vehicles for a period in excess of thirty (30) days.

.    .    .

l) New roads, except to provide low-impact temporary access to logging. Such temporary roads shall be re-seeded within six months of the cessation of such logging.

(CE at 4-5). Except when it is otherwise permitted, the conservation easement also prohibits commercial mining and/or quarrying and timber harvesting. (Id.) The easement is silent on the transfer of mineral rights or the ability to engage in the exploration for natural gas. (See id. at 4-6).

The conservation easement also reserves rights for the landowner, "including the right to engage in or permit or invite others to engage in, all uses of the Property that are not expressly prohibited herein." (Id. at 6). The easement allows quarrying on the Property for the landowner's personal use (or the personal use of his family members), so long as the quarrying is in compliance with all state regulations. (Id. at 4). The

9

easement also reserves for the landowner a limited right to engage in timber harvesting.  (Id. at 4-5).  Rajoppi has opined that extensive timber thinning has occurred on the property pursuant to Section 4(e) of the conservation easement.  (PSOF ¶ 10).

### D. Hydraulic Fracture Drilling for Natural Gas

By the early 1990's, hydraulic fracturing techniques were developed to stimulate shale gas bearing zones.  (DSOF ¶ 82)  "Slick water" fracture treatment is the most commonly used technique to stimulate Marcellus Shale gas wells.  (Id.)  Water-based hydraulic fracturing includes the injection of water and chemicals more than 5,000 feet below the earth's surface inside of a cement sheathed steel casing.  (PSOF ¶ 82).  The "slick-water" treatment techniques use a large volume of water, typically several million gallons per well.  (DSOF ¶ 83).  Depending on the particular well, sand may be added to the water as a proppant.  (DSOF ¶ 83; PSOF ¶ 83).

Fluids used in the water-based hydraulic fracturing process consist of extremely low levels and concentrations of certain chemicals, most of which remain in the Marcellus gas reservoir after injection.  (PSOF ¶ 82).  Some Marcellus shale drillers mix chemical additives to the water at the drill site.  (Id. ¶ 83; DSOF ¶ 83).  The use of water-based hydraulic

fracturing fluid does not impact any lakes, rivers, streams, creeks, pools, wetlands or other natural body of water. (PSOF ¶ 82). Additionally, drilling pads have environmental protection in multiple layers, laid down to secure the containment of any substance. (Id.) There are also containment walls and all the associated protections in government regulations, including approved erosion and sediment control plans. (Id.)

Marcellus Shale drilling sites typically affect five to ten acres per square mile with multi-well pads for temporary activities lasting about two months. (Id. ¶ 84). Well construction involves extensive earth disturbances, including the placement of roads, drilling pads and pipelines.[5] (DSOF ¶ 84). Moreover, once the drilling and well-stimulation phases are completed, the only well pad surface structures typically visible are a well head, a gas meter in the gas line, a unit to separate gas from water, water tanks and occasionally a container of antifreeze. (PSOF ¶¶ 59, 84). The gas meter and unit to separate gas from water are typically the size of a mid-sized car; while, at a maximum, typical water tanks are

_____

[5] During the drilling and completion of the well, natural gas drillers use the following equipment: drilling rig; hydraulic fracturing equipment; well logging units; mud tanks; drill mud; drill cuttings; waste impoundments; drill pipe and well casing; cement and drilling mud mixing units; diesel and gasoline storage tanks; chemical tanks; water supply piping; equipment and impoundments. (PSOF ¶ 59). The above-listed equipment is removed after the drilling and completion phase is completed. (Id.)

the size of an elephant.  (Id. ¶ 84)  Furthermore, a pipeline connecting the well to the other pipelines would be buried, typically three feet below ground, resulting in little post-construction surface disturbance.  (Id.)

To a certain extent, property owners have control of the surface activity through negotiation of their leases.  (Id. ¶¶ 49, 51, 59, 84).  For example, many leases contain statements requiring the drillers to minimize disturbances to the surface of the land.  (Id. ¶ 84).

Upon depletion of the gas reservoir, the well is plugged, abandoned and the surface equipment is dismantled, leaving the land in its original condition.  (Id.)  Only a thin three foot steel post would mark the well's location.  (Id.)  Surface disturbances from well-drilling and completion would be considerably less invasive, and persist for less time, than typical stone quarrying or timbering operations.  (Id.)  Furthermore, the extraction of natural gas requires little maintenance when compared to the extraction or mining of other natural resources.  (Id.)

### E. Proposed Natural Gas Drilling on the Property

Except for a possible disagreement between Stockport and Norcross regarding access to the Property, there were no disputes between Stockport and Norcross relating to the conservation easement from March 2002 to December 2007.  (Id. ¶ 45; DSOF ¶ 45).  This relative harmony,

12

however, was disrupted in 2007.  During this year, Stockport learned that natural gas may be located under the property, and Stockport was approached by Chesapeake Appalachia, LLC as well as Hess Corporation in connection with leasing the Property for natural gas operations.  (PSOF ¶¶ 46-47; DSOF ¶¶ 46-47, Compl. ¶ 14).

On December 19, 2007, Stockport advised Norcross of Chesapeake's offer to lease the Property.[6]  (PSOF ¶ 46; Doc. 47-7, Def.'s Dep. Ex. 20, Letter dated Dec. 19, 2007).  Stockport sought to enter a lease with Chesapeake to obtain rental payments and royalties on gas extracted and sold from the Property.  (DSOF ¶¶ 47-48).

Norcross, through its executive director Karen Outlaw, responded to Stockport's letter on January 16, 2008 and stated that "gas mining is prohibited under the terms of the Conservation Easement for several reasons."  (Doc. 47-7, Def.'s Dep. Ex. 21, Letter dated Jan. 16, 2008).  Specifically, Outlaw stated that such conduct is forbidden by the easement's prohibition of industrial or commercial uses and its prohibition of mining and certain quarrying activities.  (Id.)  Additionally, she expressed

---

[6] In his letter dated December 19, 2007, Rajoppi, on behalf of Stockport, stated that the lease with Chesapeake would have a duration of ten years and that the Property would have to be restored upon completion of natural gas activities.  (Doc. 47-7, Def.'s Dep. Ex. 20, Letter dated Dec. 19, 2007).

Norcross' belief that the extraction of natural gas would interfere with the stated goals and values of the Conservation Easement.  (Id.)

On March 5, 2008, Stockport's counsel contacted Norcross' counsel, expressing disagreement with Norcross' interpretation of the conservation easement.[7]  (PSOF ¶ 46).  On March 25, 2008, Norcross, through its counsel, again responded that it believes the easement prevents Stockport from entering into a natural gas lease.  (Id.)  On April 21, 2008, Norcross' counsel sent further correspondence, stating that "[i]t is also the Norcross position that it would be a violation of Section 4(d) of the [Easement], although it is acknowledged that oil and gas drilling are not specifically mentioned in this section."  (Id.)

Even though they exchanged drafts and negotiated terms, Chesapeake and Stockport did not agree with respect to any drill sites, road access plans, or final lease terms prior to the cessation of negotiations.  (DSOF ¶¶ 46, 66-67).  Stockport also received a draft lease from Hess Corporation; however, Stockport never responded to Hess with regard to this draft lease, nor did Stockport negotiate a lease with Hess.

---

[7] In its March 5, 2008 letter, Stockport acknowledged that, after the completion of the well drilling process, natural gas operators would need "periodic access to the well head to check pressure, etc." and that well equipment would be evident on the surface of the Property.  (DSOF ¶ 86).

(Id. ¶ 63).  Presently, Stockport possesses no technically-specific plans

concerning well construction, well drilling, roads, development or

rededication activities relevant to the proposed natural gas operations at

issue.  (Id. ¶ 60).

Although Stockport never reached a final agreement with a natural

gas drilling company, three aspects of the potential lease agreements are

pertinent to the instant motion:   (1) the use and construction of new roads;

(2) the construction and use of commercial structures at drill sites and (3)

the storage and removal of debris.

### 1. Use of and Construction of Roads

During discussions regarding a possible lease, Chesapeake advised

Stockport that new roads may need to be installed on the property and that

such roads would be traversed by commercial vehicle traffic.  (Id. ¶¶ 49-

50).  In fact, a draft lease between Chesapeake and Stockport granted

Chesapeake the right "to use or install roads," among other rights.[8]  (DSOF

_____

[8] In a subsequent lease exchanged between Stockport and
Chesapeake, this exact language ("to use or install new roads") was not
included.  Rather, in this subsequent draft lease, Chesapeake is granted
the right "to use portions of the Leasehold acreage as designated and
approved by Lessor in writing to access drilling sites on the Leasehold or
on acreage unitized with acreage from the Leasehold for the construction
and maintenance of roads, electric power and telephone facilities, pipelines
with appurtenant facilities . . . ."  (DSOF ¶¶ 51-53; Doc. 47-8, Def.'s Dep.
Ex. 35, Paid-Up Oil and Gas Lease).

¶¶ 51, 53; Doc. 47-7, Def.'s Dep. Ex. 22, Paid-Up Oil and Gas Lease).

## 2. Construction and Use of Commercial Structures

In August 2008, Chesapeake informed Stockport via email that it interpreted the "Conservation Restrictions, Item (G)" to prohibit Chesapeake from erecting or occupying any temporary dwelling structures on the leasehold. (DSOF ¶ 57). Chesapeake could not agree to this condition because, "[d]uring drilling operations, temporary facilities are on site, as drilling is a 24 hour operation and there is personnel on site at all times." (Id.) Moreover, in an August 10, 2008 email from Leonard in which Rajoppi was copied, Leonard stated that Chesapeake "will need language that will allow temporary structures during the drilling and fracking process and we'll need [Norcross] to sign off on that." (Doc. 47-7, Def.'s Dep. Ex. 30, Email dated Aug. 10, 2008).

Rajoppi and Stockport understood that it was a concern of Norcross that there not be any temporary housing units on the Property, and Rajoppi assumed that Norcross would not sign off on temporary commercial structures. (DSOF ¶ 56; PSOF ¶ 56). In addition to acknowledging the possibility that temporary structures are necessary for natural gas operations, both Stockport and Norcross accept the fact that natural gas operations require a substantial amount of industrial and commercial

16

equipment to be brought on the property.  (DSOF ¶ 59; PSOF ¶ 59).

### 3. *Storage and Removal of Debris*

Both the Chesapeake and Hess proposed leases contained provisions that contemplated and accounted for the presence of debris during the exploration and production operations.  (DSOF ¶¶ 62, 64; PSOF ¶¶ 62, 64).  Condition No. 26 to Chesapeake's Oil and Gas Lease Addendum states that Chesapeake will remove "all debris" at the cessation of operations.  (DSOF ¶ 62).  Condition 18.4 of the Hess form lease similarly provides that "debris created from Lessee's operations will be moved to a mutually acceptable location in accordance with all applicable laws" and that debris shall be removed from the property at the conclusion of the operations.  (Id. ¶ 64; Doc. 47-8, Def.'s Dep. Ex. 40, Hess Lease).

### F. Procedural History

On March 18, 2011, Stockport filed a one count complaint against Norcross seeking a declaratory judgment pursuant to 28 U.S.C. § 2201, *et seq.*, the Declaratory Judgment Act.  (See Compl.).  Stockport contends that the conservation easement does not prohibit natural gas drilling, which Stockport argues is treated differently from coal mining under Pennsylvania law.  (See id. ¶¶ 29-39).  Stockport further avers that the parties to the conservation easement did not intend for its provisions to prohibit natural

gas exploration.  (See id. ¶¶ 44, 46).

Norcross responded to the complaint with a Rule 12(b)(6) motion to dismiss on the grounds that a natural gas lease is obviously inconsistent with the conservation easement.  (Doc. 4, Mot. to Dismiss).  Stockport opposed Norcross' motion to dismiss and asserted that the court should treat Norcross' motion to dismiss as a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(d).  (Doc. 10, Cross-Mot. for Summ. J.).  The court denied Norcross' motion to dismiss and Stockport's cross motion for summary judgment.  (Doc. 35, Mem. & Order dated Mar. 1, 2012).

On March 15, 2012, defendant filed an answer to the complaint in which it asserted a counterclaim against plaintiff for a declaration that the conservation easement prohibits natural gas extraction via surface drilling. (Answer ¶ 75).  The parties engaged in discovery for the next eight months, and, at the close of discovery, defendant filed a motion for summary judgment.  (Doc. 46, Mot. For Summ. J.).  The parties fully briefed this motion and the court held oral argument, bringing this case to its current posture.

**Jurisdiction**

This court has jurisdiction pursuant to the diversity statute, 28 U.S.C. § 1332. Plaintiff Stockport Mountain Corporation LLC is a Pennsylvania limited liability company with a place of business in Pennsylvania. Defendant Norcross Wildlife Foundation, Inc. is a Massachusetts corporation with a place of business in New York. Although this action is one for declaratory relief pursuant to 28 U.S.C. § 2201, the amount in controversy is nevertheless in excess of $75,000 as the potential value of the ten-year lease on the Land is in excess of this amount. See Columbia Gas Transmission Corp. v. Tarbuck, 62 F.3d 538, 541 (3d Cir.1995) ("Where the plaintiff in a diversity action seeks injunctive or declaratory relief, the amount in controversy . . . . is determined by the value of the object of the litigation." (internal quotation omitted)). Because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00, the court has jurisdiction over the case. See 28 U.S.C. § 1332.

Because we sit in diversity, the substantive law of Pennsylvania shall apply to the instant case.[9] Chamberlain v. Giampapa, 210 F.3d 154, 158

_____

[9] The court notes that neither party disputes the application of substantive Pennsylvania state law and that the choice of law provision of the conservation easement provides that the "Easement shall be governed

19

(3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).

However, "federal courts are to apply state substantive law and federal

procedural law." Hanna v. Plumer, 380 U.S. 460, 465 (1965). The instant

case is before the court in the form of a declaratory judgment action, and

Federal Courts have concluded that declaratory judgment actions are

procedural rather than substantive. See Munich Welding, Inc. v. Great Am.

Ins., Co., 415 F. Supp. 2d 571, 574 (W.D. Pa. 2006) (citing Fed. Kemper

Ins. Co. v. Rauscher, 807 F.2d 345, 352 (3d Cir. 1986)). As a result, the

court will apply substantive Pennsylvania law in interpreting the

conservation easement in addition to the procedural strictures of the

federal Declaratory Judgment Act, 28 U.S.C. § 2201.

**Standard of Review**

Granting summary judgment is proper "'if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law.'"

Knabe v. Boury Corp., 114 F.3d 407, 410 n.4 (3d Cir. 1997) (quoting FED.

R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of

*some* alleged factual dispute between the parties will not defeat an

_____

by the laws of the State of Pennsylvania." (C.E. at 11).

otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. See Anderson, 477 U.S. at 248. A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by establishing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories demonstrating a genuine issue for trial. Id. at 324; see also Goode v. Nash, 241 F. App'x 868 (3d Cir. 2007) ("[A]lthough the party opposing summary judgment is

entitled to 'the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact,' and 'cannot rest solely on assertions made in the pleadings, legal memorandum, or oral argument.'" (quoting <u>Berckeley Inv. Grp., Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006))).

**Discussion**

At the close of discovery, Norcross filed a motion for summary judgment. Norcross' motion does not ask the court to consider whether natural gas drilling is generally harmful to the environment or whether natural gas drillers can restore explored properties to pristine conditions. Nor is the court placed in a position where it must decide the validity of the conservation easement; the parties largely agree that it is valid and legally enforceable. Rather, the court must decide if genuine issues of material fact exist with respect to the permissibility of surface drilling for natural gas under the conservation easement.

The court will first assess whether a genuine issue of material fact exists with respect to the permissibility of surface drilling for natural gas under the conservation easement. Then, the court will decide whether Norcross is entitled to attorneys' fees and costs pursuant to section 7.2 of

the conservation easement.

## I. No Genuine Issue of Material Fact Exists Regarding the Impermissibility of Surface Natural Gas Drilling on the Property

Norcross contends that Stockport fails to satisfy its burden to demonstrate the permissibility of surface natural gas drilling activities under the conservation easement. Specifically, Norcross asserts that such activities are prohibited by section 4 of the conservation easement. Stockport disagrees with Norcross' assertion and maintains that, even after discovery has been completed, the terms of the conservation easement remain ambiguous. Given these alleged ambiguities, Stockport contends that the analysis in our motion to dismiss opinion remains undisturbed. After careful consideration, the court agrees with Norcross that Stockport has failed to meet its burden to demonstrate the permissibility of natural gas activities under the conservation easement.

In Pennsylvania, courts will first look to the language of a contract when attempting to determine the parties' intent, and when the language of the contract is unambiguous, courts will enforce the express language of the contract as it embodies the intent of the parties. See Steuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982); see also Crawford Cent. Sch. Dist. v. Commonwealth, 888 A.2d 616, 623 (Pa. 2005) (noting that "[w]hen contractual language is clear and unequivocal, its meaning must be

determined by its contents alone."). Courts apply the same rules of construction to easement grants as they do to contracts. See Zettlemoyer v. Transcon. Gas Pipeline Corp., 657 A.2d 920, 924 (Pa. 1995) (citations omitted). Thus, as is the case with any contract, "the rights conferred by the grant of an express easement must be ascertained solely from the language of the deed, provided that the deed language is unambiguous." PARC Holdings, Inc. v. Killian, 785 A.2d 106, 112 (Pa. Super. Ct. 2001).

In this case, Stockport contends that trial is necessary to resolve ambiguities in the language of the easement. The court disagrees. Whether a contract is ambiguous is a question of law and the burden rests on the party claiming that ambiguity exists to show the necessary indefiniteness of meaning. See Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 76 (3d Cir. 2011) ("Courts have the responsibility to determine as a matter of law whether contract terms are clear or ambiguous." (citing Mellon Bank, N.A. v. Aetna Bus.Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980)); Int'l Union United Auto., Aerospace & Agric. Implement Workers of Am. v. Skinner Engine Co., 188 F.3d 130, 145 (3d Cir. 1999) ("'The party claiming that a contract is ambiguous must first convince the judge this is the case . . . .'" (quoting Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 565 (7th Cir. 1995))).

To determine whether a contract is ambiguous, courts applying Pennsylvania law must "consider 'the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of the meaning.'" Baldwin, 636 F.3d at 76 (quoting Mellon Bank, N.A., 619 F.2d at 1011).  The objective, extrinsic evidence courts may use to assess whether an ambiguity exists includes "the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning."  In re New Valley, 89 F.3d 143, 150 (3d Cir. 1996) (citing Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir. 1993)).  "Extrinsic evidence notwithstanding, the parties remain bound by the appropriate objective definition of the words they use to express their intent."  Baldwin, 636 F.3d at 76 (quoting Mellon Bank, N.A., 619 F.2d at 1013); see also Seven Springs Farm, Inc. v. Croker, 748 A.2d 740, 750 (Pa. Super. Ct. 2000) (holding that in the absence of technical terminology, the words of a contract are to be construed according to their plain and ordinary meaning); Stewart v. McChesney, 444 A.2d 659, 661 (Pa. 1982) ("The accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given [to] the agreement.").

Moreover, the Pennsylvania General Assembly recognized "the importance and significant public and economic benefit of conservation and preservation easements" and enacted the Pennsylvania Conservation and Preservation Easement Act (hereinafter the "Act"). 32 PA. CONS. STAT. ANN. § 5052. The Act instructs courts interpreting conservation easements to construe the terms of those easements liberally. See 32 PA. CONS. STAT. ANN. § 5055(c)(2). More specifically, the Act provides that "[a]ny general rule of construction to the contrary notwithstanding, conservation or preservation easements shall be liberally construed in favor of the grants contained therein to effect the purposes of those easements and the policy and purpose of this act." Id. The Act also addresses Pennsylvania law's historical prejudice against negative easements and provides that "[a] conservation or preservation easement is valid even though . . . it imposes a negative burden." 32 PA. CONS. STAT. ANN. § 5056. Thus, the court will first liberally construe and examine the words within the conservation easement and then turn its attention to any objective, extrinsic evidence.[10]

---

[10] Stockport contends that the court should narrowly construe the easement against Norcross because it is a negative restriction. Stockport maintains that the Act does not apply because Norcross was not registered with the Pennsylvania Department of State at the time the conservation easement was executed. Stockport asserts that Norcross does not have

## A. Section 4 of the Conservation Easement

The words constituting the conservation easement are susceptible to only one reasonable interpretation with respect to the instant issue; that surface natural gas drilling on the property is prohibited.  To reach this conclusion, the court did not need to look beyond section 4(c) of the easement, which prohibits "industrial or commercial uses of any kind."[11] (CE at 4).  "Industrial" and "commercial" are not defined in the conservation easement, as such, the court will give these words their ordinary

_____

standing to challenge the conservation easement as "[a] holder of the easement" under the Act because such holders, by definition, must be registered with the Department of State.  See 32 PA. CONS. STAT. ANN. §§ 5053, 5055(a)(4).  The court, however, does not find merit with this technical argument.  It is undisputed that Norcross is currently registered with the Department of State.  (Doc. 52, Br. in Opp'n to Def.'s Mot. for Summ. J. at 20 n.5).  The Act does not specify when such a charitable organization must register with the Department of State to qualify as a "holder."  See 32 PA. CONS. STAT. ANN. § 5053.  Additionally, given the undisputed validity of the conservation easement, the court finds that, at a minimum, Norcross qualifies as a third-party with the right of enforcement.  See 32 PA. CONS. STAT. ANN. § 5055(a)(5).  Thus, the court will construe the conservation easement liberally, as courts are instructed by the Act.

[11] Although the prohibitions on the construction of new roads, the dumping of debris and the construction of new structures potentially impact the proposed natural gas drilling operations, the court need not examine these other provisions because natural gas drilling falls under the industrial and commercial prohibition.

27

meaning.[12]  See Kripp v. Kripp, 849 A.2d 1159, 1163 (Pa. 2004).

"Commercial" is defined as "occupied with or engaged in commerce or work intended for commerce."  *Commercial*, MERRIAM-WEBSTER DICTIONARY ONLINE, http://www.merriam-webster.com/dictionary/commercial (last visited Aug. 22, 2013). "Commerce" is defined as "the exchange or buying and selling of commodities on a large scale involving transportation from place to place." *Commerce*, MERRIAM-WEBSTER DICTIONARY ONLINE, http://www.merriam-webster.com/dictionary/commerce (last visited Aug. 22, 2013).  "Industrial" is defined as "of or relating to industry," and "industry" is defined as "systematic labor especially for some useful purpose or the creation of something of value," or, industry is alternatively defined as "a distinct group of productive or profit-making enterprises."  *Industrial*, MERRIAM-WEBSTER DICTIONARY ONLINE, http://www.merriam-webster.com/dictionary/industrial (last visited Aug. 22, 2013); *Industry*, MERRIAM-WEBSTER DICTIONARY ONLINE, http://www.merriam-webster.com/dictionary/industry (last visited Aug. 22, 2013).

---

[12] To help shed light on the common meaning of "commercial" and "industrial," both Stockport and Norcross rely upon the Merriam-Webster Online Dictionary.  The court finds this resource illustrative and will use it to shed light on the common definitions of "commercial" and "industrial."

28

Here, Stockport seeks to enter into a lease with a natural gas driller to obtain rental payments and royalties on gas extracted and sold from the Property. Because the proposed natural gas activities necessarily involves the division of proceeds from the sale and transportation of a commodity, such activities fall under the common meanings of "commerce" and are "commercial" in nature. Such activity would also be "commercial" in nature because drilling would require the use of commercial traffic and the erection of temporary commercial structures.

Moreover, all parties agree that the drilling process involves the use of machinery in a systematic effort to generate marketable natural gas. Accordingly, the proposed natural gas activities fall under the common meaning of "industry" and are "industrial" in nature given the fact that any natural gas would be produced via the systematic efforts of employees operating machinery.[13] As such, when the conservation easement at issue

_____

[13] The court notes that Federal regulations recognize mineral mining and "oil and gas exploration, production, processing, or treatment operations" as one of the eleven categories of industrial activities that require NPDES permits for stormwater discharge. See 40 C.F.R. § 122.26(b)(14)(iii). Moreover, the North American Industry Classification System, the standard used by statistics agencies in classifying businesses, classifies drilling oil and gas wells as an industry. (Doc. 47-11, Harvey Decl. Ex. B, NAISC Code 213111). Although such sources are not dispositive with respect to the definitions of words used in the conservation easement, the court finds that these sources inform our decision that

is liberally construed, the proposed natural gas activity falls under section 4(c)'s prohibition of "commercial" or "industrial" activity.

Stockport contends that genuine issues of material fact preclude summary judgment because the easement contains three related ambiguities pertaining to proposed natural gas activity. First, Stockport points to section 5 of the easement, which reserves for the landowner the "right to engage in or permit or invite others to engage in, all uses of the Property not expressly prohibited herein." (CE at 6). Stockport exclaims that sections and 5, when read together, create an ambiguity regarding the permissibility of natural gas activity. Second, Stockport argues that the easement is ambiguous because some commercial and industrial activities, such as limited timbering and quarrying, are allowed. Third, Stockport asserts than an ambiguity is created in the easement by the absence of an explicitly prohibition against natural gas drilling. The court addresses Stockport's arguments *in seriatim*.

The court is not convinced by Stockport's arguments with respect to ambiguities existing in the text of the conservation easement. As the court discussed above, the proposed natural gas activities fall under the

---

natural gas drilling falls under the common meaning of the word "industrial."

30

common meaning of commercial and industrial activity, and such activity is categorically prohibited in section 4(c) of the easement.  Thus, the proposed natural gas drilling activity cannot be reserved for Stockport under section 5 because such activity is already proscribed in section 4(c).  Additionally, the court is compelled by Pennsylvania law to liberally construe the terms of the conservation easement.  As such, the court cannot read section 5 so broadly as to crowd out section 4(c)'s prohibition against commercial or industrial activity of any kind.

The court is also unswayed by Stockport's argument that section 4 is ambiguous because it permits limited exceptions to the prohibition on commercial and industrial activity.  Stockport ignores the structure of section 4, which contains a general prohibition on commercial and industrial activity while exempting certain home occupations, limited timbering and limited quarrying.  Rather than creating ambiguity, the exemption of certain activities from section 4's prohibitions indicate that the easement's drafters intended to prohibit all commercial or industrial activities not specifically exempted.  See Koken v. Reliance Ins. Co., 893 A.2d 70, 82 (Pa. 2006) (finding, in the context of statutory interpretation, that "[w]here mandatory language is employed, there is no need to engage in the redundancy of disapproving individual exceptions."); Dep't of Transp.

v. Mosites Constr. Co., 494 A.2d 41, 43-44 (Pa. 1985) (applying the maxim of *expressio unius est exclusio alterius*, which "translates into the proposition that the mention of particular items implies the purposeful exclusion of other items of the same general character.").

Finally, the court rejects Stockport's assertion that an ambiguity is created by the absence of an "explicit prohibition against drilling for natural gas in the Easement." (Doc. 52, Br. in Opp'n to Def.'s Mot. for Summ. J. at 18). It would be unreasonable of the court to require conservation easements to enumerate every conceivable prohibited activity. Stockport's interpretation of the easement would render section 4(c) meaningless, and the tenants of Pennsylvania contract law prevent the court from construing the easement in such a way. See Flynn v. Fed. Express, No. 07-2455, 2008 WL 2188549, at *2 (E.D. Pa. May 23, 2008) ("In construing a contract, the court adopts the most reasonable and probable interpretation while bearing in mind what the parties intended to accomplish through the agreement. . . . Effect must be given to all provisions in the contract." (citations omitted)).

Accordingly, the court finds that section 4(c) of the conservation easement prohibits the proposed natural gas activities, and that this section is not susceptible to a reasonable alternative interpretation. See

John Wyeth & Bros. Ltd. v. Cigna Int'l Corp., 119 F.3d 1070, 1073-74 (3d Cir. 1997).  Thus, Stockport has failed to carry its burden to establish an ambiguity with respect to the words actually used in the conservation easement.

### B. Objective, Extrinsic Evidence Reveals Section 4 of the Conservation Easement to be Unambiguous

In addition to examining the words actually used in the contract or easement, Pennsylvania courts examine objective, extrinsic evidence when assessing such documents for ambiguities.  See Baldwin, 636 F.3d at 76. When the instant case was before the court at the motion to dismiss stage, the court lacked the benefit of a clearly developed record.  The court held in its motion to dismiss opinion that ambiguities could exist in the easement if Stockport's allegations were revealed to be true during discovery.  In particular, the court held that it was premature to rule that the proposed natural gas activities violated section 4(c) in light of Stockport's allegations that the parties to the conservation easement intended to allow such activities.  (See Doc. 35, Mem. & Order dated March 1, 2012 at 15-17).  A review of the present, developed record reveals that Stockport's allegations, regarding the parties' intent, are unsubstantiated.

Stockport attempts to rely on external evidence and presents several arguments it believes create a genuine issue of material fact with respect

to ambiguities in the easement; however, it can point to no piece of objective, extrinsic evidence to support its contention that an ambiguity exists.  Stockport asserts, without citation to the facts, that the easement contains a balancing test.  In particular, Stockport states that the conservation easement "seeks to balance the desires to conserve certain ecological values of the Property with the rights of the landholder to use the Property for any purpose not expressly prohibited by the Conservation Easement, including various industrial and commercial activities, at least some of which are far more inherently damaging to the environment than well-managed natural gas extraction."  (Doc. 52, Br. in Opp'n to Def.'s Mot. for Summ. J. at 12-13).  This balancing test is not supported by the text of the easement or any other piece of external evidence.  Rather, this interpretation of the easement appears to be founded in nothing more than Stockport's allegations in support of this theory.  Such allegations are not given the presumption of truth at this stage in the litigation and, without more, no reasonable jury could find for Stockport on this point.

Additionally, it is not the function of the court to alter the parties' agreement or rewrite what has been agreed to.  Nw. Savings Bank & Fin. Servs. v. NS First St. LLC, 802 F. Supp. 2d 580, 588 (M.D. Pa. 2011) (citing Steuart, 444 A.2d at 662).  Although Stockport's approach to the

conservation easement may be ecologically more sensible, the court is not tasked with amending the easement to allow for the most environmentally friendly approach. Instead, the court must enforce the intent of the parties as manifested through the written agreement.

With regard to the parties' intent to prohibit natural gas drilling, Stockport asserts that the parties did not know of the feasibility of shale gas production when they executed the conservation easement, thus they could not have intended for its prohibition. To support this proposition, Stockport relies upon Reagan's deposition testimony that gas drilling "wasn't an issue" when he executed the conservation easement in 2002. (Doc. 52, Br. in Opp'n to Def.'s Mot. for Summ. J. at 19).

The external evidence Stockport points to, however, does not reasonably establish that the parties to the conservation easement intended to permit surface natural gas activities. The law does not require that parties to a conservation easement consider every possible use of property before it can be prohibited. Rather, the law requires that the court accept the plain meaning of the easement language used, and not "the silent intentions of the contracting parties, [to] determine[] the construction to be given [to] the agreement." Willison v. Consol. Coal Co., 637 A.2d 979, 982 (Pa. 1994). The court cannot overlook the categorical prohibition

in section 4(c) simply because the parties did not envision a boom in natural gas drilling.

Stockport also turns to the negotiations leading up to the execution of the conservation easement as external evidence that an ambiguity exists. Stockport asserts that the easement is ambiguous because Reagan executed the easement on behalf of both SFP and Norcross. Stockport cites no law indicating that such a situation creates an ambiguity, and the court fails to see how a reasonable jury could infer ambiguities from the fact that Reagan executed the easement for both entities.

Moreover, the objective, extrinsic evidence revealed during discovery indicates that Norcross, SFP and Rajoppi understood that section 4(c) would prohibit commercial and industrial activities such as surface natural gas drilling. For instance, Rajoppi and his attorney commented on drafts of the conservation easement and specifically requested that certain commercial and industrial activities, such as timbering and quarrying, be allowed under the easement. Additionally, as early as 1999, Rajoppi and SFP entered into an agreement which recognized that a conservation easement would be placed on the property to limit the development and use of the land. In fact, Rajoppi admitted in his deposition, contrary to Stockport's position, that there was nothing about the conservation

easement he did not understand.  With respect to the parties conduct under the lease, the court notes that Stockport sought Norcross' permission to enter into a gas lease; indicating that it suspected such conduct was not permitted under the easement.  Thus, no reasonable jury could find that ambiguities arise given the objective external evidence revealed during discovery.

Accordingly, a review of Stockport's arguments with respect to objective external evidence does not reveal the existence of ambiguities in the easement.[14]  Although Stockport contends that the court must rule as it did in our March 1, 2012 motion to dismiss opinion, the court disagrees. The allegations the court assumed to be true at the motion to dismiss stage in the proceedings have not been established during discovery.  The summary judgment standard of review forbids the court from presuming Stockport's allegations to be true, and the court must consider only those

_____

[14]  The court also notes that, in an attempt to create a genuine issue of material fact, Stockport advances a policy argument premised on the common law "Rule of Capture." (Doc. 52, Br. in Opp'n to Def.'s Mot. for Summ. J. at 13).  While interesting, the "Rule of Capture" does not create an ambiguity in the easement, nor does it create a genuine issue of material fact that must be resolved by the jury.  Pennsylvania law does not require the invalidation of easements and contracts which result in the restriction of mineral rights access.  Thus, without a factual or legal basis to invalidate the prohibition on commercial or industrial activities, the court finds Stockport's argument on this point unconvincing.

facts established in the record. As such, the court will grant Norcross

summary judgment as the record reveals that the easement is

unambiguous.

## II. Attorneys' Fees and Costs

In addition to seeking declaratory relief, Norcross requests the court

to enter judgment in its favor with respect to attorneys' fees and costs.

Section 7.2 of the conservation easement addresses the cost of

enforcement and specifically provides:

> Any costs incurred by Grantee in enforcing the terms of this
> Easement against Grantor, including, without limitation, costs of
> suit, except witness fees and attorneys' fees, . . . shall be borne
> by Grantor. If Grantor prevails in any action to enforce the
> terms of this Easement, Grantor's costs of suit, including
> without limitations, attorneys' fees, shall be borne by Grantee.

(CE at 8).

As the court explained above, Stockport succeeded SFP, the grantor

under the easement, and agreed to be bound by the easement's terms.

(Doc. 47-7, Def.'s Dep. Ex. 19, Deed). Also, as the court explained above,

Norcross engaged Stockport in this action to prevent Stockport from

receiving permission from this court to engage in activity that would violate

the conservation easement. The court agrees with Norcross that its

interpretation of the conservation easement is correct, as such, the court

will award Norcross attorneys' fees and costs associated with defending

this action and enforcing the conservation easement.  Norcross will have fourteen days to submit evidence of its reasonable costs and attorneys' fees.

**Conclusion**

After careful consideration, the court finds that Stockport has failed to carry its burden to point to evidence in the record establishing that the proposed activities are permitted by the conservation easement. Moreover, the court finds that Stockport has failed to demonstrate that the conservation easement is ambiguous.  The words actually used in the conservation easement are "[i]ndustrial or commercial uses of any kind." When liberally construed, these words can only be interpreted as prohibitive of surface natural gas drilling.  Additionally, the extrinsic evidence presented does not create a genuine issue of material fact as to whether an ambiguity exists in the easement.  Accordingly, the court finds that Stockport cannot prevail if this case were to proceed to trial.  Norcross' motion for summary judgment will be granted and the court will enter judgment in Norcross' favor.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STOCKPORT MOUNTAIN** | : | **No. 3:11cv514** |
| **CORPORATION LLC,** | : | |
| **Plaintiff** | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **NORCROSS WILDLIFE** | : | |
| **FOUNDATION, INC.,** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

**AND NOW**, to wit, this 27th day of August 2013, it is hereby **ORDERED** as follows:

1) Defendant Norcross Wildlife Foundation, Inc.'s motion for summary judgment (Doc. 46) is **GRANTED**;

2) The Clerk of Court is directed to enter judgment in favor of Defendant Norcross Wildlife Foundation pursuant to 28 U.S.C. § 2201, and it is **DECLARED** that Section 4(c) of the Conservation Easement prohibits the extraction of oil and natural gas by surface methods through the drilling of wells.

3) Defendant Norcross Wildlife's request for reasonable costs and attorneys' fees pursuant to section 7.2 of the Conservation Easement is **GRANTED**. Defendant shall have fourteen (14) days from the date of this order to submit their litigation costs and an itemized list of attorneys' fees. Plaintiff shall then have fourteen (14) days from the date of Defendants' filing to lodge objections; and

4) The Clerk of Court is directed to **CLOSE** this case.

BY THE COURT:

s/ James M. Munley
**JUDGE JAMES M. MUNLEY
United States District Court**

40